**SO ORDERED.**

**SIGNED this 3rd day of October, 2022.**



Dale L. Somers
United States Chief Bankruptcy Judge

Designated for online publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In re:

Ronald A. Goodwin
Michelle L. Goodwin,

                 Debtors.

Case No. 17-12205-11

**Memorandum Opinion and Order
Denying Motion to Sell Personal Property**

Debtors Ronald and Michelle Goodwin are nearing the finish line to consummate the confirmed plan in their almost five-year individual Chapter 11 case. Facing pressure from unsecured creditors and the U.S. Trustee to consummate their plan and seek a final decree, Debtors propose a private sale of equipment (including one rock crusher) and a truck in a lump sum

transaction.[1] Two problems arose: 1) one of the pieces of equipment—the rock crusher—is itself the result of a disputed purchase transaction, and 2) objections to the private sale were filed by the U.S. Trustee, an unsecured creditor, and Gator Industrial, LLC – who purports to have sold the rock crusher not to Debtors, but to one of the Debtor's separate business entity.

After an expedited hearing to take evidence on all issues, the Court denies the motion to sell the personal property in the proposed private sale. The Court concludes the property should be auctioned to achieve the highest value for the estate.

The Court also concludes the postpetition, postconfirmation transaction regarding the rock crusher was a sale, to both Debtor Ronald Goodwin and Mr. Goodwin's separate non-debtor LLC, and that the terms of a purported lease/purchase agreement do not apply to the rock crusher. The Court concludes it has jurisdiction over the rock crusher, and the rock crusher should be included in Debtors' auction of the items of personal property.

Regarding a separately filed motion to dismiss by the U.S. Trustee, the Court continues the motion to dismiss to November 9, 2022, by which time

---

[1] Doc. 623 (motion to sell), Doc. 629 (amended motion to sell). Debtors appear by Mark Lazzo and Justin Balbierz. The U.S. Trustee appears by Richard Kear. Creditor Air Capitol Recycling, LLC appears by Ron D. Beal. Interested Party Gator Industrial, LLC appears by Edward Robinson.

2

the auction of the personal property should be concluded and a motion for final decree contemplated.

## I. Findings of Fact

Debtor Ronald Aaron Goodwin—who goes by Aaron—has been involved in some manner of heavy metal recycling, salvage, and rock work his entire adult life. Prepetition, Mr. Goodwin operated through one of a dozen business entities (some corporations, some limited liability companies), many of which had "Aaron's" in the name.[2] Through this work, Mr. Goodwin developed a working relationship and a friendship with Roger Hines, who worked in the same field.

Debtors filed their Chapter 11 bankruptcy petition on November 8, 2017, almost five years ago. About four and a half months postpetition, in March 2018, Aaron's Auto & Metal Recycling, LLC was formed with the Kansas Secretary of State,[3] as the business entity through which Mr. Goodwin would conduct his postpetition salvage, recycling, and rock crushing work. It was clear from Mr. Goodwin's testimony that there has been little separation between the business and personal life of Mr. Goodwin – the "Aaron's" account pays all expenses, whether personal or business.

---

[2] *See* Doc. 1 p. 8 (listing business names in the eight years prepetition).
[3] Gator Industrial, LLC Ex. 1.

3

In October 2018, Debtors' Chapter 11 repayment plan was confirmed.[4] In that plan, Debtors proposed to pay all secured claims through multiple sales of real property, and unsecured claims were to be paid in full.[5] The confirmed plan requires income of $6000 per month from Aaron's Auto & Metal Recycling LLC.[6] The only sales of personal property that are mentioned are the sale of certain "non-essential truck scales."[7]

About the same time the plan was confirmed, Mr. Goodwin took possession of the rock crusher from Mr. Hines. There is no doubt there was some kind of agreement between Mr. Goodwin and Mr. Hines related to the rock crusher, but the question of who the contracting parties were, and the contours of that agreement, are debated. Mr. Goodwin testified that Mr. Hines knew the crusher was in poor condition and would take a lot of work to make it operable, so he made a deal with Mr. Goodwin to sell it to him for $225,000, which they later changed to $250,000 with a $25,000 repair credit. Mr. Goodwin testified that the parties agreed Mr. Goodwin would make payments to Mr. Hines through trades, crushing work, or cash payments. Aaron's Auto & Metal Recycling, LLC, then made a $50,000 payment on November 16, 2018.

---

[4] Doc. 285.
[5] *Id.* p. 6.
[6] *Id.* p. 5.
[7] *Id.* p. 6.

Mr. Hines testified that at the start, the parties agreed to a cash sale, but when Mr. Goodwin failed to pay, the parties changed course. Mr. Hines testified that by the spring of 2019 his colleagues at Gator Industrial, LLC were getting worried about the lack of payment, so he and Mr. Goodwin talked and agreed Gator Industrial, LLC would need to do something to protect itself. Mr. Hines testified that he and Mr. Goodwin agreed to a lease purchase agreement and the *payment* of interest, but never agreed on a *rate* of interest. In May 2019, Gator Industrial, LLC engaged an attorney, Charles Apt, III, to draft a lease purchase agreement.

On May 9, 2019, Mr. Apt forwarded a lease purchase agreement to Mr. Goodwin's personal attorney, Morgan Koon, and asked Mr. Koon to review the agreement and advise if it met their approval.[8] The draft agreement is between Gator Industrial, LLC and "Aaron's Auto and Metal, LLC," with Mr. Goodwin as guarantor.[9] The lease purchase agreement requires payments of $10,000 per month, and an attached payment schedule anticipated financing $175,750 (the $250,000 "sale price," less a $25,000 allowance for repairs, less a $50,000 down payment, plus a $750 delivery fee). The agreement grants Gator Industrial, LLC a purchase money security interest in the crusher and permits repossession of the crusher upon default.

---

[8] Gator Industrial, LLC Ex. 9.
[9] Gator Industrial, LLC Ex. 2 p. 1.

On May 20, 2019, Mr. Apt reported to his contacts at Gator Industrial, LLC that he had not heard anything back on the agreement. Floyd Langley, from Gator Industrial, LLC, then responded to Mr. Apt on May 28, 2019 as follows: "We have gotten no response. We want to repossess the machine. Roger [Hines] would like for you to call him to discuss . . . Please verify the UCC filing was completed correct? [sic]."[10] Mr. Apt then had additional discussions with Gator Industrial, LLC, verifying the UCC filing should be made. Mr. Langley confirmed the UCC filing should be made and stated: "Roger [Hines] was called by the borrower who has a $100,000 payment for him. We still want to file the UCC filing though."[11]

That same day, Mr. Goodwin signed a May 29, 2019 "Invoice," issued from Gator Industrial, LLC.[12] This is the only document signed by any party. The terms of the Invoice are for an "equip sale" of the 2012 Kolberg crusher for $250,000, less a $25,000 allowance for repairs. The Invoice then shows a $50,000 down payment and the $100,000 payment received. Interest of $8551.56 was crossed out and "2000" was handwritten, yielding a total of $77,000 due.[13] The "Bill To" section of the Invoice states "Aaron's Auto &

---

[10] Gator Industrial, LLC Ex. 11 p. 1.
[11] Gator Industrial, LLC Ex. 12 p. 1.
[12] Debtors' Ex. 5 p. 6.
[13] The $77,000 is computed as: $250,000, minus $25,000, minus $50,000, minus $100,000, plus $2000.

6

Metal" first, with Ronald Aaron Goodwin listed just below. The address given is 2655 North Broadway, Wichita, Kansas 67209—one of Mr. Goodwin's former business locations and one of the pieces of real property that was eventually auctioned in Debtors' bankruptcy case. Mr. Hines testified he drove to Wichita to pick up the $100,000 check, that he and Mr. Goodwin discussed the lease purchase agreement, and that they agreed the $100,000 would "cover" the $10,000 monthly payments for "awhile."

On June 3, 2019, Mr. Langley then filed a UCC financing statement for a security interest in the rock crusher, listing both "Aaron's Auto and Metal, LLC" and Mr. Goodwin as debtors.[14] The box for Lessee/Lessor is checked. Mr. Hines testified that he had always done business with an "Aaron's" entity, never Mr. Goodwin personally.

Over the next couple of years, Mr. Hines and Mr. Goodwin many times discussed both Mr. Goodwin's financial status and payments on the rock crusher in text messages. In December 2019, Mr. Goodwin first mentioned his bankruptcy in a message to Mr. Hines. The next month, in January 2020, Mr. Goodwin traded a truck to Mr. Hines, for a $11,000 payment on the rock crusher. About six months later, Mr. Goodwin asked Mr. Hines for grace in getting money to him, and informed Mr. Hines that he was working on a

---

[14]  Gator Industrial, LLC Ex. 4.

couple of deals. The next month, in July 2020, Mr. Goodwin informed Mr.
Hines via text message that he had sold his house and would "have the rest of
the money on the crusher."[15] The next month, August 2020, Mr. Hines then
followed up with Mr. Goodwin twice, and Mr. Goodwin assured Mr. Hines he
would get him a cashier's check as soon as possible.

Several months then passed. In November 2020, Mr. Hines informed
Mr. Goodwin that they could not wait any longer, and shortly thereafter, in
December 2020, Mr. Goodwin made a $10,000 payment. Another $10,000
payment was made a few weeks later.

Again, many more months passed, this time taking us to August 2021.
At that point, Mr. Hines again sent a text message to Mr. Goodwin indicating
that he needed money from him. Mr. Goodwin then made a $5000 payment.
This was the final payment made on the crusher. To sum, the payments
made on the crusher are as follows:

| Date: | Payment: |
|---|---|
| 11/16/2018 | $50,000 check |
| 5/29/2019 | $100,000 check |
| 1/14/2020 | $11,000 trade |
| 12/5/2020 | $10,000 check |

---

[15] Debtors' Ex. 5, Declaration of Roger Hines p. 9.

| | |
|---:|---:|
| 12/24/2020 | $10,000 check |
| 8/4/2021 | $5000 check |

All checks making payment were made from the Aaron's Auto & Metal Recycling, LLC account. Mr. Goodwin claims another trade was made of parts totaling $750, but no evidence or additional testimony was received about this trade. Gator Industrial, LLC has not credited this trade as a payment and it is apparently disputed.

In September 2021, Debtors sought employment of an auction company to auction certain real property.[16] No relevant texts between Mr. Hines and Mr. Goodwin occurred through this period until December 2021, at which point Mr. Goodwin sent Mr. Hines a message that he was working a couple of crushing jobs and would make the money "to pay you off."[17]

Then in March 2022, Mr. Goodwin informed Mr. Hines that he had "Mike" coming over to take pictures of some equipment he was going to sell. Mr. Hines and Mr. Goodwin then had the following exchange:

> Mr. Hines: Need to discuss balance and what is fair on interest with you
> Mr. Goodwin: 3500
> Mr. Hines: It's $41,000 plus interest
> Mr. Goodwin: Where do you come up with the extra $6,000[?] I owed you $35,000

---

[16] Doc. 467 (application to employ); Doc. 475 (order).
[17] Debtors' Ex. 5, Declaration of Roger Hines p. 13.

9

> Mr. Goodwin: So what are you saying the payoff is
> Mr. Hines: At 6 percent it is $13,639
> Mr. Hines: $54,639 total [sic throughout][18]

Mr. Hines and Mr. Goodwin did not send another message to each other for several days. Then on March 28, 2022, Mr. Goodwin sent Mr. Hines a message that indicated he had asked Mr. Hines's "guy" to list "my rock crusher" and five other pieces of equipment (a screen, conveyors, a couple excavators, and a muncher); this person did not list anything but the crusher, and so Mr. Goodwin stated he was going to advertise the other equipment for sale so he could "get your money as fast as possible."[19] Mr. Hines responded that his guy thought he could "sell it pretty quick."[20] Mr. Goodwin responded that he was going to try to advertise the equipment together and try to get more, and also said he told the person he wanted "350" (presumably $350,000) for the crusher, but could go "around $300" (presumably $300,000).[21] Mr. Goodwin also told Mr. Hines he wanted to "take the rest of the money and pay my unsecured so I can be out of bankruptcy."[22]

In April 2022, Mr. Goodwin continued to try and sell the crusher. Mr. Goodwin sent messages to Mr. Hines on April 14 and on April 22, 2022, that

---

[18] *Id.* p. 14 (sic throughout).
[19] *Id.*
[20] *Id.*
[21] *Id.* p. 15.
[22] *Id.*

he was working with multiple people to sell the crusher. Also in April 2022, Debtors worked within their bankruptcy case to complete the auction of the multiple pieces of real property referenced above. An auction of the real property was completed on April 21, 2022. Mr. Goodwin informed Mr. Hines that the auction of the real property occurred, that he thought the auctions garnered enough to pay much of his unsecured debt as well, and that he would begin sending payments to Mr. Hines until he got the crusher sold. The sale of the real property closed on June 6, 2022.[23]

In July 2022, Debtors then filed their motion to sell the personal property.[24] In that motion, Debtors propose to sell the rock crusher, two radial stackers, a power screen, a John Deere excavator and a Caterpillar excavator, a muncher head, and a 1974 Kenworth truck to Conspec, Inc. for $350,000.[25] From that, Debtors propose to pay $54,000 "to Roger Hines . . . that was borrowed for the purchase of the Property,"[26] then to unsecured creditors, with remaining balance, if any, to Debtors. No notice of the motion was given to Mr. Hines or to Gator Industrial, LLC.

---

[23] Doc. 566 Ex. A p. 2, Doc. 572 Ex. A p. 2; Doc. 574 Ex. A p. 2.
[24] Doc. 623, amended at Doc. 629. For ease, the Court will refer to the motion as amended as simply the motion.
[25] The property identified is: a 2012 KPI-JCI Crusher, serial # 412078, two Powerscreen Radial Stackers, a Chieftan 1400 power screen, a John Deere 892 ELC Excavator, serial # FF892EX007207, a Caterpillar 325B Excavator, serial #2JR01722, a SUI Manufacturing Muncher Head, serial # 46200807, Model UMB 310/12, and a 1974 Kenworth, serial # 148478S.
[26] Doc. 629 p. 1.

11

In late July, Gator Industrial, LLC, contacted Mr. Apt to begin the repossession process on the crusher. Mr. Apt referred them to counsel in Wichita, and on August 2, 2022, Gator Industrial, LLC hired attorney Edward Robinson. The crusher was located in Wichita on August 5, 2022, and on August 8, 2022, Gator Industrial, LLC contacted a transport company to make arrangements to move the crusher and begin preparing to buy the permits to transport it on public roads. That afternoon, Mr. Robinson learned of Debtors' bankruptcy via an online search, and learned of the motion to sell that included the crusher.[27]

Contrary to the amount stated in their motion, Debtors now claim the amount owed on the crusher is $40,250, and argue there is no provision for payment of attorney's fees. Gator Industrial, LLC objects to the sale of the crusher because it claims the amount due is $66,494.64 and asserts a lien in the crusher in that amount, but will consent to the sale of the crusher if it is reimbursed that amount and attorney's fees of $6000. Gator Industrial, LLC argues the crusher was governed by the lease purchase agreement between the Aaron's LLC and Mr. Goodwin, that Mr. Goodwin was only a guarantor to that agreement, and that the Court therefore has no jurisdiction over the postconfirmation property.

---

[27] The Court permitted Gator Industrial, LLC to file an objection to the sale motion out of time.

Both the U.S. Trustee and Creditor Air Capitol Recycling, LLC (hereinafter ACR) also object to the motion to sell. The U.S. Trustee objects that the motion did not disclose the proposed contract with Conspec, Inc. and notes that it will need paid U.S. Trustee fees as a result of the sale. ACR also objects based on the lack of disclosure of the underlying contract, the lack of detail provided within the motion, and the sale price for the property. ACR also argued there was no proof of a security agreement between Mr. Hines and Debtors.

Regarding the value of the property to be sold, Mr. Goodwin testified that he initially wanted $450,000 for all pieces. He testified that he negotiated the amount to $350,000, based on the value of what he had paid for each piece, the condition it was in now, and the fact he would not have to move the personal property as it was already physically located on the real property on which the prospective buyer needed to use it.[28] Upon cross examination, Mr. Goodwin testified the crusher individually was worth about $200,000 to $250,000, the radial stackers were worth about $50,000 ($10,000 for one and $40,000 for the other), and the power screen was worth about

---

[28] The personal property is located on one of the pieces of real property sold by Debtors at auction in April 2022, with a June 2022 closing. The prospective buyer – Conspec, Inc. – has an agreement with the purchaser of that real property to clean up the real property. It will take heavy equipment like that proposed to be sold by Debtors to do this work.

$50,000. Mr. Goodwin did not give individual values for the John Deere excavator, the Caterpillar excavator, the SUI Manufacturing muncher head, or the 1974 Kenworth truck.

At the evidentiary hearing on this matter, the parties informed the Court that Conspec, Inc. was no longer interested in purchasing the property. The parties then agreed to continue with the presentation of the evidence so the Court could rule on its jurisdiction and the authority of Debtors to file a subsequent motion to sell the personal property.

## II.  Conclusions of Law

## A.  Debtors' Motion to Sell the Personal Property is Moot; an Auction is Ordered

The Court denies Debtors' motion to sell the personal property for several reasons. To sell property of the estate out of the ordinary course of business under 11 U.S.C. § 363(b),[29] a sound business reason must exist to sell the property, adequate notice of the terms must be given, the proposed

---

[29]  All future references to "Code," "Chapter," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

There is debate about whether a postconfirmation Chapter 11 debtor can sell property under § 363 or only under § 1123(a)(5)(D). *E.g.*, *In re Ditech Holding Corp.*, 606 B.R. 544 (Bankr. S.D.N.Y. 2019). In this case, the confirmed plan does not, and could not, provide for the current scenario because at least some of the property did not exist at confirmation. The plan contemplates the sale of real estate, the sale of "truck scales," and the payment in full of unsecured creditors, but it does not contemplate sale of equipment. Regardless, even if what is happening is technically a modification of the plan to permit sale of this equipment under § 1123(a)(5)(D), the Court would apply the same general concepts to determine if § 1127 permits modification of the plan for the sale.

sale price must be fair and reasonable, and the buyer must act in good faith.[30] Debtors have the burden to prove the reasonableness of a proposed sale.[31] Motions to conduct such sales are governed by Federal Rule of Bankruptcy Procedure 6004. Under Rule 6004(f), sales may be held by public auction or by private sale.

First, the motion to sell is denied as moot. As noted above, at the evidentiary hearing on this matter, Debtors learned the potential purchaser of the personal property (Conspec, Inc.) was no longer interested in completing the sale. The parties therefore agreed the motion as filed must be denied, as the factual basis for the motion was no longer present.

Second, the motion to sell is denied because the Court concludes the property should be auctioned to achieve the highest value for the estate. The motion to sell proposes to sell every piece of equipment (including the rock crusher) and one truck in a single sale to one buyer for $350,000. This value appears understated.

---

[30] *In re Buerge*, Nos. KS-12-074, 11-20325, KS-12-077, KS-12-078, KS-13-022, KS-13-023, KS-13-024, KS-13-025, 2014 WL 1309694, at *9 (10th Cir. BAP Apr. 2, 2014). Other courts articulate factors to be considered differently, but the "fair and reasonable" standard is common. *E.g.*, *In re Premier Concrete, LLC*, No. 11-10-11154 JA, 2010 WL 1780046, at *2 (Bankr. D.N.M. May 4, 2010) ("Non-exclusive factors used by courts in considering whether to grant a motion to sell . . . include: 1) whether there was any improper or bad motive involved; 2) whether the price is fair and reasonable and whether the transaction occurred at an arm's length; and 3) whether there were adequate sales procedures, including proper exposure to the market and fair and reasonable notice to all parties in interest.").
[31] *In re Buerge*, 2014 WL 1309694, at *9.

15

Regarding the rock crusher, Mr. Goodwin paid $225,000 for the rock crusher in late fall 2018.[32] There was no dispute the crusher was in poor condition when Mr. Goodwin took possession. Mr. Goodwin then did significant work to the rock crusher, improving it. Mr. Goodwin testified at length about the repairs made to the crusher: he removed and replaced the main conveyor, replaced wear belts, fixed the engine due to a faulty electronic control module, and placed all new bearings, among many other things. Mr. Goodwin testified the crusher is now in good condition, which implies it should be sold for more than the $225,000 initially agreed as its value in late 2018. Despite that, at the hearing on this matter, Mr. Goodwin testified the rock crusher today was worth about $200,000 to $250,000. But a value of $200,000 to $250,000 is improbable based on Mr. Goodwin's testimony about the vast improvements he made to the rock crusher in the few years since it was purchased for $225,000. Debtors produced no evidence about depreciation of a large piece of equipment such as a rock crusher. In addition, in spring 2022, Mr. Goodwin's text messages show he wanted $350,000 for the rock crusher, but would have settled for $300,000. The value of the rock

---

[32] Whether the value was $250,000 with a $25,000 repair credit, or an agreed-$225,000, the end result is the same, so the Court will state the initial price as $225,000.

16

crusher decreasing by $100,000 in such a short time (from the March 2022 text messages to the July 2022 motion to sell) is improbable.

Regardless, Mr. Goodwin testified that of the additional equipment to be sold, the two radial stackers were worth about $50,000, and the power screen was worth about $50,000. So even if the rock crusher remains worth "only" $225,000, Mr. Goodwin testified he believed four of the individual pieces of equipment were worth $325,000 ($225,000 for the rock crusher, $50,000 for the radial stackers, and $50,000 for the power screen). Obviously, when adding the additional values for the other pieces of equipment (the John Deere and Caterpillar excavators, and the muncher head) and the truck (the 1974 Kenworth), the proposed sale price of $350,000 is too low. The Court concludes the proposed sale is not fair and reasonable.

The Court recognizes Mr. Goodwin's wish to see this property sold and Debtors' case closed, but the fastest and most efficient method to do so is to ensure payment to as many unsecured creditors as possible through the sale proceeds of the personal property at issue.[33] And the best way to maximize

---

[33] *See In re Premier Concrete, LLC*, 2010 WL 1780046, at *3 (denying a proposed sale because the assets were not adequately exposed to the marketplace, no advertising was completed, and no reasonable investigation was made to ascertain the value of the assets; rather the debtor accepted the first and only offer made in an effort to make a quick sale prior to conversion of the case); *cf. In re Coastal Indust., Inc.*, 63 B.R. 361, 366 (Bankr. N.D. Ohio 1986) (permitting an emergency sale when ample evidence was presented through updated appraisals and expert testimony).

17

those sale proceeds is with a fair market auction of the personal property.[34] Debtors did not carry their burden to show a private sale is fair and reasonable. The assets should be exposed to the marketplace via an auction to garner the highest possible price.

## B.  The Court Has Jurisdiction Over the Rock Crusher and it Should be Included in the Auction

The Court concludes the postpetition, postconfirmation transaction regarding the rock crusher was a sale, to both Debtor Ronald Goodwin and to Mr. Goodwin's separate non-debtor LLC, and that the terms of the purported lease purchase agreement do not apply to the rock crusher. The Court concludes it has jurisdiction over the rock crusher.

### 1.  *The Transaction Regarding the Rock Crusher was a Sale, to Both Mr. Goodwin Individually and his LLC*

First, the Court concludes the transaction regarding the rock crusher was a sale, not a lease. Mr. Hines and Mr. Goodwin had a handshake agreement for a sale in late 2018. The parties settled on a $225,000 price, and Mr. Goodwin would pay Mr. Hines through trades, payments of cash, or labor on jobs. When six months passed and only the initial $50,000 payment was made, Mr. Hines understandably got nervous and sought to change their

---

[34] *See In re CPJFK, LLC*, 496 B.R. 290, 301 (Bankr. E.D.N.Y. 2011) (noting a formal appraisal is not required, but a debtor must show a proposed sale is for market value, "the best offer received in a competitive bidding process").

18

agreement. Mr. Hines and his company had a lease purchase agreement drafted. That lease purchase agreement was presented to Mr. Goodwin; Mr. Hines and Mr. Goodwin may have even discussed it. But the Court concludes Mr. Goodwin never agreed to the terms of the lease purchase agreement.

Rather, the only thing signed by the parties, and the only thing the Court concludes the parties agreed to, was the May 29, 2019, Invoice, reflecting an equipment sale, between Gator Industrial, LLC and *both* Mr. Goodwin and his LLC.[35] The Court concludes Mr. Hines abandoned the lease purchase agreement idea after receiving the $100,00 check from Mr. Goodwin on that date.

Mr. Hines testified his arrangement was solely with Mr. Goodwin's business, but the Court concludes after considering all the evidence that this belief was not supported. All communications from Mr. Hines during the relevant time were with Mr. Goodwin and discussed Mr. Goodwin as the purchaser solely, not his LLC. The checks were from the LLC, but Mr. Goodwin treated that bank account as all encompassing—it paid his business expenses and personal expenses. Mr. Hines never referenced an agreement with the business in any of his communications to Mr. Goodwin, and neither did Mr. Goodwin.

---

[35] The Court finds it immaterial that the stated LLC was "Aaron's Auto & Metal, LLC" instead of "Aaron's Auto & Metal Recycling, LLC."

19

To sum, the Court has considered the evidence and concludes the transaction was a sale, made to Mr. Goodwin personally and his LLC.

> 2.    *There is No Security Interest in the Crusher*

Second, the Court concludes Gator Industrial, LLC does not have a security interest in the crusher. Again, the parties may have discussed Gator Industrial, LLC wanting or needing to make such an arrangement. But the only conclusion the Court can draw from the facts is that they did not do so. For a creditor to have a security interest in collateral per the Uniform Commercial Code, the debtor has to "authenticate"—i.e., sign—a security agreement.[36] There is no signed security agreement. Again, the Court thinks it likely Mr. Hines abandoned the idea after getting the significant $100,000 payment. Regarding the UCC-1 financing statement filed on June 1, 2019, the attempt to jump ahead to perfection without first securing a purchase money security interest cannot transform the transaction.

---

[36] Kan. Stat. Ann. § 84-9-203(b). Gator Industrial, LLC argues Kansas recognizes the theory that a composite group or collage of documents can be evidence of a security agreement, and then argues that composite is present here between the lease purchase agreement and the Invoice, relying on *In re Brannan*, 532 B.R. 834 (Bankr. D. Kan. 2015). But in *Brannan*, there were signed documents, when read together, that unequivocally showed a "mutual intention to create or retain a lien" and a description of what was encumbered. *Id.* at 843. The facts are vastly different here, where there is no unequivocal *mutual* intent to create a lien.

### 3. *The Terms of the Lease Purchase Agreement Do Not Apply*

Third, because of these conclusions, the Court additionally concludes the terms set out in the lease purchase agreement do not apply. The parties simply never agreed to an interest rate. They never agreed to terms regarding payment more formally than Mr. Goodwin would pay Mr. Hines the $225,000 over time. The parties certainly never discussed or agreed to the payment of attorneys' fees.

The Court concludes Mr. Goodwin still owes $41,000. This represents the initial $225,000 purchase price:

- less the November 16, 2018 payment of $50,000,

- less the May 28, 2019 payment of $100,000,

- plus the agreed $2000 interest added on May 28, 2019,

- less the January 14, 2020 trade value of $11,000,

- less the December 5, 2020 payment of $10,000,

- less the December 24, 2020 payment of $10,000, and

- less the August 4, 2021 payment of $5000.

The Court does not credit the alleged $750 trade; Mr. Goodwin gave little details and did not provide evidence of that transaction. The total owed of $41,000 was agreed to by Mr. Hines in text messages in March 2022 and the parties agree on all payments made and on the one $11,000 trade. The Court

21

concludes Mr. Goodwin and his LLC owe this amount to Gator Industrial, LLC as a postpetition, postconfirmation, unsecured debt.

The Court does conclude Mr. Goodwin agreed to the payment of interest. The testimony was conclusive that there was agreement that interest should be paid, although it is also clear there was never agreement on the rate of that interest. At the time Mr. Goodwin signed the Invoice, he agreed to $2000 in interest through that date. The Court therefore concludes the Kansas default legal rate of interest applies to the transaction, computed from the May 29, 2019 Invoice date to payment, as provided for in K.S.A. § 16-201.

### 4. *The Rock Crusher is Estate Property*

The first question the Court must answer when considering its jurisdiction is whether the rock crusher is property of the estate. Under § 1115(a), for individual Chapter 11 debtors, property of the estate includes a debtor's earnings and property acquired by a debtor after filing until the case is closed, dismissed, or converted. But, under § 1141(b), confirmation of a plan vests all property of the estate in the Chapter 11 debtor, unless the plan specifies otherwise. Debtors' plan addresses vesting, and states that personal property will vest in the reorganized Debtors at confirmation.[37] If vesting of

---

[37] *See* Doc. 285 p. 4 ¶ (v) (confirmation "will vest in the Reorganized Debtors all personal property of the Debtors"), Doc. 285-1 p. 18 ("Except as provided otherwise

estate property in Debtors was delayed, then the Court would easily conclude the estate continued to exist post confirmation under § 1115(a). But when vesting occurs at confirmation, the question of what property exists in the estate until case closure, dismissal, or conversion, and thus this Court's jurisdiction over that property, is murkier.

There is little case law discussing what is considered property of the estate post-confirmation in Chapter 11 individual debtor cases. In *In re Meyrowitz*,[38] the bankruptcy court considered its jurisdiction in such a situation, and because of the statutory similarity between treatment of individual Chapter 11 debtors and individual Chapter 13 debtors,[39] applied

---

in this Plan, confirmation of the Plan shall vest in the Reorganized Debtors all remaining property of the estate free and clear of all liens and claims of creditors, except those liens that are retained per the terms of this Plan."). Despite these provisions, Debtors' plan also has a provision that if the case converts to Chapter 7 after confirmation, then "all property acquired by the Reorganized Debtors after confirmation of the Plan, will become property of the Chapter 7 estate." Doc. 285 p. 7.

[38] *Kimpel v. Meyrowitz (In re Meyrowitz)*, No. 10-03227, 2010 WL 52922066 (Bankr. N.D. Tex. Dec. 20, 2010).

[39] *Compare* § 1115(a) (in individual Chapter 11 cases, property of the estate includes all property and earnings acquired "after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first") and § 1141(b) ("[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor") *with* § 1306(a) (property of the estate includes all property and earnings acquired "after commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first") and § 1327(b) ("[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor").

23

the case law developed in the Chapter 13 context.[40] The Court will do the

same here.

In Chapter 13 cases, there are multiple approaches to determining the

extent of postconfirmation estate property when vesting occurs at

confirmation: the estate-termination approach,[41] the estate-transformation

approach,[42] the estate-replenishment approach,[43] the estate-preservation

---

[40] *In re Meyrowitz*, 2010 WL 52922066, at *4-*5; *see also Rogers v. Freeman (In re Freeman)*, 527 B.R. 780, 788 (Bankr. N.D. Ga. 2015) (concluding approaches employed by courts in Chapter 13 cases should be applied in individual Chapter 11 cases). In *Meyrowitz*, the court ultimately applied the estate replenishment approach, and held that all post-confirmation income was property of the estate, and remained so until the case was either closed, dismissed or converted. *In re* Meyrowitz, 2010 WL 52922066, at *5. But the case law in individual Chapter 11 cases is varied, just like it is in the Chapter 13 context. *See, e.g.*, *Baur v. Chase Home Fin., LLC (In re Baur)*, 433 B.R. 898, 900 (Bankr. M.D. Fla. 2010) (following confirmation, post-petition earnings are no longer property of the estate).

[41] *E.g.*, *California Franchise Tax Board v. Jones (In re Jones)*, 420 B.R. 506, 515 (9th Cir. BAP 2009) (adopting estate-termination approach).

[42] *E.g.*, *Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1340 (11th Cir. 2000) (adopting estate transformation approach as a compromise between the "two extremes" of the estate-termination approach and the estate-preservation approach); *Black v. U.S. Postal Serv. (In re Heath)*, 115 F.3d 521, 524 (7th Cir. 1997) (adopting estate-transformation approach and stating "while the filing of the petition for bankruptcy places all the property of the debtor in the control of the bankruptcy court, the plan upon confirmation returns so much of that property to the debtor's control as is not necessary to the fulfillment of the plan"); *Security Bank of Marshalltown v. Neiman*, 1 F.3d 687, 690–91 (8th Cir. 1993) (concluding Chapter 13 estate continued post-confirmation and postpetition debts were necessary for preservation of estate).

[43] *E.g.*, *Barbosa v. Soloman*, 235 F.3d 31, 36-37 (1st Cir. 2000) ("[B]y virtue of sections 1327(b)-(c), property of the estate at the time of confirmation vests in the debtors free of any claims from the creditors. The estate does not cease to exist however, and it continues to be funded by the Debtors' regular income and post-petition assets as specified in section 1306(a).").

24

approach,[44] and the conditional vesting approach.[45] A Chapter 13 treatise

describes those five approaches as follows:

> [1] Estate-termination approach—At confirmation the estate
> ceases to exist and all property of the estate, whether acquired
> before or after confirmation, becomes property of the debtor.
>
> [2] Estate-transformation approach—At confirmation, all property
> of the estate becomes property of the debtor except property
> essential to the debtor's performance of the plan; the Chapter 13
> estate continues to exist, but it contains only property necessary to
> performance of the plan, whether acquired before or after
> confirmation.
>
> [3] Estate-replenishment approach—At confirmation, all property
> of the estate becomes property of the debtor; the Chapter 13 estate
> continues to exist and "refills" with property defined in § 1306 that
> is acquired by the debtor after confirmation, without regard to
> whether that property is necessary to performance of the plan.
>
> [4] Estate-preservation approach—The vesting of property in the
> debtor under § 1327(b) does not remove any property from the
> Chapter 13 estate, whether acquired before or after confirmation;
> property remains in the estate until the case is closed, dismissed
> or converted. The debtor's rights and responsibilities with respect
> to property of the estate may change somewhat at confirmation,
> but the existence and composition of the estate are not disturbed
> by § 1327(b).
>
> [5] Conditional-vesting approach—At confirmation vesting gives
> the debtor an immediate and fixed right to use estate property, but

---

[44] *E.g.*, *Annese v. Kolenda (In re Kolenda)*, <u>212 B.R. 851, 853</u>–55 (W.D. Mich. Aug. 18, 1997) (vesting does not remove property from the estate, estate continues after confirmation, and "property acquired post-confirmation is added to the estate until the case is closed, dismissed, or converted" (internal quotations omitted)).

[45] *E.g.*, *Woodard v. Taco Bueno Rests., Inc.*, No. 4:05-CV-804-Y, <u>2006 WL 3542693</u>, at *9 (N.D. Tex. Dec. 8, 2006) (interpreting vesting as the right to "enjoy all of the assets of the bankruptcy estate free and clear" once the debtor completes the obligations of the confirmed plan and is entitled to a discharge).

that right is not final until the debtor completes the plan and obtains a discharge.[46]

Although there is Tenth Circuit case laws recognizing the divergent views on § 1327(b)'s impact on estate property postconfirmation, no approach has been adopted.

In *In re Talbot*,[47] the United States appealed from a Utah district court's order directing the Internal Revenue Service to disgorge monies paid by Chapter 13 debtors from the proceeds of the postconfirmation sale of their home.[48] The Chapter 13 trustee argued, in part, that the disgorgement order should be affirmed because the wording of the plan delayed vesting of the home in the debtors as permitted by § 1327(b), which contains the "[e]xcept as otherwise provided in the plan" language.[49] The Tenth Circuit expressly declined the opportunity to construe the vesting effect of § 1327(b) and decided the issue against the position of the Chapter 13 trustee based on a conclusion that the confirmed plan did not, in fact, contain a delayed vesting provision.[50] With respect to § 1327(b), the Tenth Circuit stated:

> This court notes that contrary to the assertions of the IRS and the acquiescence of the Trustee, it is not without question that the vesting provisions of § 1327(b) operate to grant absolute "ownership" of estate property to the debtor upon confirmation of

---

[46] Keith M. Lundin, *Lundin On Chapter 13* § 120:3, www.LundinOnChapter13.com (last visited October 3, 2022).

[47] *United States v. Richman (In re Talbot)*, 124 F.3d 1201 (10th Cir. 1997).

[48] *Id.* at 1204-05.

[49] *Id.* at 1206-07.

[50] *Id.* at 1208.

a Chapter 13 plan. Nevertheless, because the Trustee does not contest the premise that § 1327(b)'s vesting provision operates to grant ownership rights, this court need not address the issue. Accordingly, the only issue before the court is whether the [Chapter 13 debtors' plan] or the order confirming the [p]lan altered § 1327(b)'s default provision of revesting ownership of the [Chapter 13 debtors'] residence in the [debtors] upon confirmation.[51]

Ultimately, the Tenth Circuit did conclude confirmation of the plan vested the property in the debtors and removed it from the estate, allowing the IRS to keep the money paid from the sale.[52] The Circuit did not, however, analyze the five approaches to vesting or choose an approach to apply in this Circuit. Cases in this District have not developed a uniform approach.[53]

---

[51] *Id.* at 1207 n.5.

[52] *Id.* at 1208 ("Because neither the Plan nor the order confirming the Plan provides otherwise, the [debtors'] residence revested in them upon confirmation of the Plan. 11 U.S.C. § 1327(b). Accordingly, the bankruptcy court's order of disgorgement cannot be affirmed on the ground that the residence was part of the bankruptcy estate.").

[53] *E.g.*, *In re Brensing*, 337 B.R. 376, 383-84 (Bankr. D. Kan. 2006) (adopting estate-preservation approach, concluding § 1327(b) "does not operate to remove property of the estate from the bankruptcy estate but merely places control of this estate property in the debtor pending conclusion of the Chapter 13 proceedings" and reasoning "[n]owhere in § 1327(b) does it state that property of the estate converts into property of the debtor upon confirmation and nowhere in this section does it state that § 1306 ceases to operate after confirmation of the plan"); *In re Richardson*, 283 B.R. 783, 802 (Bankr. D. Kan. 2002) (adopting estate-transformation approach and concluding postconfirmation life insurance proceeds were not property of the estate); *In re Gyulafia*, 65 B.R. 913, 916 (Bankr. D. Kan. 1986) (concluding that because under § 1327(b) and (c) confirmation of a Chapter 13 plan vests all property of the estate in the debtor and releases the estate from all claims and interests of creditors, postpetition taxes are incurred by the debtor, not by the estate, and therefore are not administrative expenses of the estate under § 503(b)(1)).

Based on the unique facts of this case, the Court concludes it need not necessarily choose an approach, because under all of the approaches save one, the rock crusher would be property of this bankruptcy estate. Under the estate-transformation approach, the rock crusher is bankruptcy estate property because it is essential to Mr. Goodwin's performance of the plan. The confirmed plan expressly depends on income from Aaron's Auto & Metal Recycling, LLC. The crusher was acquired for Mr. Goodwin to perform work, and thereby obtain income, for his LLC to make his plan payments. That is clear from both testimony and the written text messages between Mr. Goodwin and Mr. Hines. The performance of Debtors' plan depended on Mr. Goodwin's generation of income from his LLC, and the rock crusher was an essential part of that work.

Likewise, under the estate-replenishment approach, the rock crusher would be estate property. In this approach, the estate refills postconfirmation with after-acquired property regardless of whether it is essential to postconfirmation fulfillment of the plan. The rock crusher would undoubtedly be estate property under this approach. Under the estate-preservation approach, the Court also concludes the rock crusher would be property of the estate. In this approach, vesting of property in the reorganized Debtors at confirmation does not alter the estate and postconfirmation property remains

28

in the estate until the case is closed, dismissed, or converted. The same end result is achieved under the conditional-vesting approach.

The only approach yielding a different result is the estate-termination approach. In this approach, the bankruptcy estate ceases to exist at confirmation. All property of the estate, whether acquired pre or post confirmation, becomes property of the reorganized debtor. The Court declines to adopt this approach. First, if an estate-termination approach is adopted, there is no longer *any* property of the estate subject to the stays of §§ 362(a)(2), (a)(3), and (a)(4) (all governing stays of certain acts against property of the estate). A creditor could access postconfirmation wages or property to satisfy postpetition debts without obtaining stay relief, despite the bankruptcy case remaining open and the debtors performing under their plan, presumably with the income they committed under their plan.[54] The spirit of both individual Chapter 11 cases and Chapter 13 cases is repayment of prepetition creditors in an orderly fashion, as defined by the Code and the confirmed plan, and adoption of an estate-termination view could hamper that ability. If the estate-termination approach is adopted, the text of § 1115(a) (and § 1306(a)) appears superfluous.

---

[54] *E.g.*, *In re Markowicz*, 150 B.R. 461, 462 (Bankr. D. Nev. 1993).

The Court therefore rejects the estate-termination approach and concludes the rock crusher is property of the estate under any of the remaining approaches.

### 5. *The Court has Jurisdiction*

The income from Mr. Goodwin's business is essential to the consummation of Mr. Goodwin's plan. The rock crusher assisted in the generation of that income, and Mr. Goodwin now seeks to sell the rock crusher to bring more income to his creditors. Under § 1142(b), this Court has jurisdiction to direct "the debtor and any necessary party . . . to perform any act . . . that is necessary for the consummation of the plan." The Court concludes it has jurisdiction over Debtors and over the rock crusher.

Gator Industrial, LLC cites *In re Houlik*[55] in support of the proposition this Court does not have jurisdiction over the rock crusher. In *Houlik*, the individual Chapter 11 debtors had a prepetition truck, and under their confirmed plan, proposed monthly installment payments to the secured creditor on that truck.[56] The plan was confirmed, it revested the truck and other assets back in the debtors, and eventually a final decree was entered, and the case closed prior to entry of discharge.[57] About two months after the

---

[55] *Santander Consumer, USA v. Houlik (In re Houlik)*, 481 B.R. 661 (10th Cir. BAP 2012).
[56] *Id.* at 664.
[57] *Id.*

case was closed, the creditor, who believed two payments had been missed, repossessed the truck.[58]

The debtors reopened their bankruptcy case and the bankruptcy court ultimately addressed whether there was a violation of the automatic stay by the creditor, a violation of the discharge injunction, and the court's jurisdiction.[59] The bankruptcy court awarded damages to the debtors based on failure to credit the payments on the truck under § 524(a)(2) and § 524(i)—discharge injunction provisions.

On appeal, the Tenth Circuit Bankruptcy Appellate Panel (BAP) rejected the assertions of violations of the automatic stay and the discharge injunction, concluding neither injunction applied,[60] and then addressed whether the bankruptcy court's order could be justified utilizing jurisdiction to sanction the creditor for violation of the plan confirmation order.[61] The BAP assessed bankruptcy court jurisdiction generally under 28 U.S.C. §§ 157 and 1334. Under those provisions, bankruptcy courts may "hear and determine all cases under title 11," "all core proceedings arising under title

---

[58] *Id.*

[59] *Id.* at 665.

[60] Regarding an alleged violation of the automatic stay, the BAP concluded without discussion that because the truck revested in the debtors upon confirmation, and the case was closed, there was no automatic stay. *Id.* at 669-70. Regarding the alleged violation of the discharge injunction, the BAP concluded the debtors had not yet received a discharge, and therefore there could be no discharge injunction violation. *Id.* at 670-72.

[61] *Id.* at 672.

11, or arising in a case under title 11," and proceedings "relate to a case under title 11." There was no core jurisdiction, so the BAP assessed whether there was related-to jurisdiction.

In the Tenth Circuit, to determine if a court has related-to jurisdiction a court asks "'whether the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy.'"[62] Post confirmation, some courts have narrowed this standard somewhat, asking if there is a "'close nexus to the bankruptcy plan or proceeding.'"[63] Other courts have slightly varied the inquiry either direction.[64]

The BAP first noted it "relevant" in the *Houlik* case that there was no "automatic stay or discharge injunction to support an exercise of jurisdiction," and then concluded post-confirmation jurisdiction was "factually dependent."[65] The BAP then found the following facts determinative: the confirmed plan revested the assets at issue in the debtors upon confirmation," the debtors' plan was substantially consummated and administered, the damages awarded by the bankruptcy court benefited the debtors and not

---

[62] *Gardner v. United States (In re Gardner)*, <u>913 F.2d 1515, 1518</u> (10th Cir. 1990) (quoting *Pacor, Inc. v. Higgins*, <u>743 F.2d 984, 994</u> (3d Cir. 1984), *overruled on other grounds by Things Remembered, Inc. v. Petrarca*, <u>516 U.S. 124, 134-35</u> (1995)).
[63] *In re Houlik*, <u>481 B.R. at 576</u> (quoting *In re Resorts Int'l, Inc.*, <u>372 F.3d 154, 167</u> (3d Cir. 2004).
[64] *Id.* at 675-76 (discussing cases).
[65] *Id.* at 673.

their creditors, and the matter at hand did not "involve noncompliance with or interpretation of" the debtors' plan.[66] The BAP in *Houlik* stated:

> Even though it is brought by the debtors, the action affects neither an integral aspect of the bankruptcy process, nor the interpretation, implementation, consummation, execution, or administration of the confirmed plan. . . . [T]he scope of the bankruptcy court's jurisdiction following confirmation . . . is reserved for matters that impact the bankruptcy process directly or involve interpretation or execution of the plan of reorganization.[67]

Because of these facts, the BAP concluded the bankruptcy court did not have related-to jurisdiction over the action by the debtors against the creditor.

The facts are in strong contrast here. In this case, there is an automatic stay in place: the Court has concluded Mr. Goodwin personally purchased the rock crusher, and that the rock crusher is estate property. But regardless, Debtors' bankruptcy case is not substantially consummated and administered, is not closed, and no discharge has been entered. Creditors are still active in this case and unsecured creditors have not been paid, as required by Debtors' confirmed plan. The sale of the rock crusher impacts "an integral aspect of the bankruptcy process"[68]—i.e., the use of estate property to fund plan payments. The execution of a plan of reorganization is impacted.

---

[66] *Id.* at 676.
[67] *Id.* at 676-77.
[68] *Id.* at 676.

The Court therefore concludes that, at minimum, it has related-to jurisdiction over the sale of the rock crusher.[69]

## III. Conclusion

Debtors' motion to sell,[70] as amended,[71] is denied. Debtors should file the appropriate pleading to employ an auctioneer to sell the personal property within ten days of the date of this Order. This Court will require that funds acquired from any sale of the property be held in trust in Debtors' counsel's trust account, pending a distribution order of this Court thereon.

The auction shall include the rock crusher, as this Court concludes it is estate property and the Court has jurisdiction over that property for the reasons stated herein.

Gator Industrial, LLC is owed $41,000 by Mr. Goodwin and Aaron's Auto & Metal Recycling, LLC for Mr. Goodwin's purchase of the rock crusher, plus interest as detailed above. Gator Industrial, LLC contends if it does not have a secured claim, it should be entitled to an administrative expense under § 503(b). If Gator Industrial, LLC wishes to pursue this argument, it

---

[69] Because the Court concludes it at minimum has related-to jurisdiction, it need not decide whether core jurisdiction exists, as provided in 28 U.S.C. § 157(b)(2)(M), (B) and (K) (matters concerning the "use or lease of property," "allowance or disallowance of claims against the estate," and "determinations of the validity, extent, or priority of liens" are core proceedings.

[70] Doc. 623.

[71] Doc. 629.

should file a claim in Debtors' bankruptcy case so stating, and the pleading could then be properly placed before the Court for ruling.

The motion to dismiss by the U.S. Trustee[72] remains pending. The Court *sua sponte* continues the motion to dismiss to November 9, 2022, by which time the auction of the personal property should be concluded and a motion for final decree should be contemplated.

**It is so Ordered.**

# # #

---

[72] Doc. 479.